## The Chatham.

### Hall v. The Chatham.

*(District Court, E. D. Virginia. November 3, 1890.)*

COLLISION—BETWEEN STEAM AND SAIL—DANGEROUS PROXIMITY.
    A steamer and a schooner approached each other end on, or nearly so, at the rate of 366 yards per minute, on a bright moonlight night, in a channel 420 yards wide. The steamer kept on her course until within 50 to 70 yards of the schooner, when the master of the schooner, alarmed at the danger, changed his course, whereupon the steamer turned and backed, but too late to avoid a collision. *Held*, that the steamer was liable, since her neglect to keep away from the schooner until within "dangerous proximity" justified the latter in changing her course.

In Admiralty.
*Sharp & Hughes*, for libelant.
*Walke & Old* and *R. H. Baker & Son*, for respondent.

HUGHES, J. . This libel is brought by the owner of the schooner F. S. Hall against the ocean steam-ship Chatham, for damages received in a collision between the two vessels which occurred on the evening of Octo- ber 4, 1889, on the Elizabeth river, at a point testified to be three-eighths of a mile north of Craney island light-house, and about five and a half

miles out from Norfolk. The schooner was bound into Norfolk from Newark, N. J., with a load of phosphate and some kegs of powder. The steamer was bound out from Norfolk for Boston, Mass., with her usual assorted cargo. The schooner was of 152 tons burden, 101 feet long, and drew 8 feet water. The steamer was of 1,900 tons, 285 feet long, 40 feet beam, and 15 feet draught. The channel, for 15 feet draught, was 420 yards wide at the place of collision. The night was a bright moonlight, with a moderate wind from N. E. The schooner was coming in on an ebb tide, before the wind, until just before the collision, and running over the ground at the rate of three and a half miles an hour. The steamer was going out on a course which her master intended to be, and I think was, about on the line of mid-channel, and was running at the rate of nine miles an hour. The two vessels, before the collision, were therefore nearing each other at the rate of 12 and a half miles an hour, or 366 yards a minute. No other than these two vessels were in the river near them. The steamer passed Craney island light at 8:12 P. M., by her own time; and the collision occurred at 8:14 P. M., or two minutes after passing Craney island. The schooner kept her course until within 50 or 75 yards of the steamer, or 8 to 12 seconds before the collision, and then starboarded helm, and threw up her starboard bow to receive the impact of the steamer, which at the same time backed her engine and ported her helm. The latter received no injury. The damages to the schooner, all told, including demurrage, are claimed to be about $1,800.

The foregoing facts are not disputed. As to other facts the evidence is very conflicting. The schooner's crew consisted of four seamen and a steward. The four seamen all testified under cross-examination as well as direct. The number of the steamer's crew is not given. Only three of them were examined, viz., the master, the lookout, and one wheelman. None other of the steamer's crew were examined, or produced for examination, for libelant. One of the wheelmen was not examined, and was not produced for examination. The four witnesses of the schooner and the lookout of the steamer concur in stating that when the steamer got within 50 to 75 yards of the schooner the schooner starboarded her helm, and all seven of the witnesses state that the steamer thereupon gave one whistle, ported her helm, and backed her engine with all speed. All agree that these maneuvers of the two vessels brought them in collision of the schooner's starboard, with the steamer's port, bow.

This collision ought not to have happened. One would naturally suppose it occurred from the schooner's master taking fright just at the critical moment, losing his head, and in blind panic thrusting his helm just in the direction contrary to the one of safety. We are in the habit of presuming that the skillful mariners who navigate great ocean steamers are very unapt to make mistakes in passing sail-vessels, and that the masters of schooners, being often men of less perfect training and less skillful seamanship, are far more liable to be the authors of collisions that happen with steamers than the masters of the steamers. This has been my own inclination of mind. But presumptions of this sort must not be allowed

to override positive evidence. There is a strong *prima facie* presumption against the steamer. She was moving in a channel 420 yards wide, meeting a schooner, in bright moonlight, with no baffling wind, and with no obstruction whatever, to require divergence from her proper course. She was bound by the law of navigation to keep out of the way of the schooner. Yet she ran so close as to endanger collision from any unforeseen maneuver of the schooner, and did run into that vessel in the wide, clear channel. The case is strongly presumptive against the steamer, whose primal duty was to keep out of the way. It is very true that her master had the right to pass near to or distant from the schooner, as he might elect to do, and that the schooner was bound by the law of navigation to keep on her course without change until the steamer passed. But there was a limit to this discretion of the master and this acquiescence of the schooner, and this limit was passed if the steamer came within so dangerous proximity to the schooner as, in its own master's judgment, to threaten his safety. In this case the schooner's master, lookout, and first officer all believed themselves in the jaws of danger when the steamer had come within 50 to 75 yards of them, end on or one point on the port bow, within 8 to 12 seconds of striking them, and her master, using the privilege of rule 24 of navigation, the right of *sauve qui peut*, starboarded his helm. Until this close and dangerous proximity had been reached, no signal of any sort had been given the schooner of the steamer's intention to pass threateningly close to her and yet to clear her. The law imposes a mutual obligation under such circumstances as these,—the sail-vessel must keep her course, the steamer must keep out of her way. But if a steamer, approaching rapidly and very threateningly, gives no indication of an intention to keep out of the sail-vessel's way; that is to say, of doing her own duty, then the schooner is relegated to its supreme right of *sauve qui peut* by any manuever suggesting itself.

The testimony taken in this case is exceedingly obfuscating and contradictory. In some respects it runs into unintelligible vagary. For instance, the weight of the evidence, both of the libelant and respondent, is that the schooner was on the "best of the west side" of the channel on the way coming up the river until a few moments before the collision. I suppose the "best of the west side" means more than half-way off between mid-channel and the western edge, and, inasmuch as half the width of the channel was 210 yards, the schooner was more than 105 yards west of mid-channel. How, then, if the steamer was near mid-channel, could she have been so near the schooner as to frighten the master into a disastrous movement of its helm? The evidence of all the schooner's seamen and of the steamer's lookout is that the two vessels were approaching each other, (four of them say end on, the other says at an angle of one point on port bows,) and that the vessels were only 50 to 75 yards distant from each other when the schooner's helm was starboarded. Evidently the schooner could not have been 105 yards out west of mid-channel when she was almost directly forward of the steamer and only 50 to 75 yards off. This consideration forces me to

reject the contention, however strongly supported by testimony, that the schooner, when she starboarded her helm, was more than 105 yards west of mid-channel.

Equally incredible is the testification that the collision occurred on the extreme eastern edge of the channel at the letter "C" marked by the steamer's master on the chart filed in the cause. That point is 210 yards from mid-channel, and if the steamer was moving in mid-channel until the schooner starboarded her helm, and the collision occurred in 8 to 12 seconds after the maneuver, how could both vessels have got to a distance of 210 yards to the east before the collision happened? More incredible still, if the schooner was 105 yards on the "best of the west side" of mid-channel, the two vessels would have had to run 315 yards across the channel to get into collision after the schooner starboarded, if the collision occurred at the place marked "C." I must reject both these contentions, urged in behalf of the respondent, and am constrained to conclude that the collision could not have occurred either as far as 105 yards west of mid-channel, or as 210 yards east of it. The steamer had no business to be so far out on either side. I cannot believe she was in either position, much less in both; and it seems to me to be a cut-throat contention in her behalf to insist that she was thus far from mid-channel on either side, west or east, or on both sides. If the schooner was 105 yards west, why should the steamer have run so far out towards the schooner there, as to frighten the master into starboarding his helm? And if the collision occurred 210 yards east of mid-channel at "C," why should not the schooner, when as far away from mid-channel as that, have escaped the steamer handsomely? I cannot but reject both these contentions.

What, then, are we to believe in this case? It is natural to presume that the master of the steamer, having the schooner either dead ahead or one point on his port bow, ran along mid-channel after passing Craney island, expecting to run very near to, but yet to clear her without risk of collision. This is my own presumption, and would seem to be the most reasonable one the case admits of. Adopting it, the question which presents itself is, did not the steamer run too near to the schooner? Did it not glide, against the master's wish and intention, and probably without his knowledge, into such "dangerous proximity" to the schooner as to produce reasonable alarm in the schooner's master, under which alarm he starboarded his helm as a means of easing the impending blow? If the steamer did run into this "dangerous proximity," then the schooner's master was justified, in any maneuver he made intended to mollify the concussion, by rule 24 of navigation, which allows a sail-vessel to change its course when in the jaws of danger. This, then, is the pivotal question in the case: Did the steamer run too near the schooner? And this question resolves itself into the form whether or not, in a channel amply wide, and clear of ships, a steamer which is approaching a sail-vessel, either end on or with the latter within one point on her port bow, and at the rate of 366 yards a minute, may run to within 50 or 70 yards of the sail-vessel without any change of course,

and without making known to the sail-vessel in some unmistakable manner that she intends keeping out of its way.

I am of opinion that this question admits of but one answer; which is, that under the conditions described a steamer has no right to run so near. Eight to twelve seconds is too short a time to leave to a sail-vessel for deciding whether or not to resort to rule 24. Of course, the case that has been stated contains as one of its essential features the assumption that the two vessels were approaching each other end on, or within one point on the port bow, and in that alignment the steamer had come within 50 or 75 yards, equivalent to 8 to 12 seconds, of the schooner. It utterly discards the contention of the respondent, that the schooner was out more than 105 yards west of mid-channel, or even 50 to 75 yards distant at right angles from the line of mid-channel pursued by the steamer. If they were approaching end on, the schooner was on that same line of mid-channel. If they were approaching, each within one point on the other's port bow, I calculate that the schooner was not further than about 15 to 20 yards from the line which the steamer was traversing, certainly not more, shortly before reaching within 50 to 75 yards of proximity.

The case stated assumes that the schooner's master had reason to be alarmed at the approach of the steamer. The first cause of this alarm was his having seen the steamer's green light soon after she passed Craney island. Respondent treats this unimportant averment as very material, and produced experts to prove that this was impossible. It is to be observed that in order that the side-light of a long, narrow, trimly-built steamer, with deck high up above water, and lights well out from the sides, may be seen half a mile off, it is not necessary for her to show her whole broadside to a ship. The schooner was half a mile distant when the steamer passed Craney island, and could have seen the Chatham's high and bold green light if the Chatham's starboard side was shown at but a very slight angle. Not only do all the seamen of the schooner testify positively that they did see the green light just after the steamer passed Craney island, but the latter's lookout testified that on passing the island a steamer has to bear a little westward; and expert Mayo avers and reiterates the same statement. I find no testimony in the case showing how many or how few points such a steamer as the Chatham must veer from a direct line to afford a brief glimpse of a side-light to a vessel half a mile ahead of her; but one of the witnesses says, what my own reflection inclines me to believe, that it requires but three or four points. On a question like this expert testimony is of little avail to contradict the positive testimony of several witnesses. The emphatic asseveration of the schooner's four seamen is that the steamer, when abreast of Craney island, showed her red light; that she soon after showed her green light for a brief space; and that after that she showed both lights, and continued to show both, seeming to approach the schooner end on, until she was within 50 to 75 yards of her; that the schooner's lookout, believing a collision to be inevitable, ran for safety to the aft part of the vessel; that, as he did so, the master

of the schooner, himself believing a collision inevitable, starboarded his helm to relieve the concussion; that thereupon the steamer blew one whistle, backed her engine with all steam, and ported her helm; and that from these two maneuvers of the respective helms the collision resulted, starboard bow of schooner striking port bow of steamer. That the respective bows of the two vessels came together in this manner is conceded; and if the testimony of the schooner's seamen, as recited, be true, then the master was justified in trying as best he could to avoid or relieve the collision. I think the testimony is true, and I think the fault was in the steamer's running into too "dangerous proximity" to the schooner, and thereby failing to keep out of her way in the sense which the law of navigation requires. See *The Carroll*, 8 Wall. 302, as to the law of "dangerous proximity." See, also, for numerous authorities on the point presented in this case, *The Schmidt* v. *The Reading*, 43 Fed. Rep. 398.

I will decree for the libelant.